# UNITED STATES DISTRICT COURT

for the

## Southern District of New York

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
9:19 am, May 17, 2022
**JEFFREY P. COLWELL, CLERK**

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) |
| Gregoire Tournant, | ) |
|  | ) |
|  | ) |
| _____ | ) |
| *Defendant* |  |

Case No.

**22 CRIM 276**

**Colorado Case No. 1:22-mj-00089-NYW**

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*     Gregoire Tournant                                                                    ,

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to Commit Securities Fraud, Investment Adviser Fraud and Wire Fraud (18 USC 371)
Securities Fraud (15 USC 78j(b) & 78ff; 17 CFR 240.10b-5; 18 USC 2)
Investment Adviser Fraud (15 USC 80b-6, 80b-17; 18 USC 2)
Investment Adviser Fraud (15 USC 80b-6(4), 80b-17; 17 CFR 275.206(4)-8; 18 USC 2)
Conspiracy to Obstruct Justice (18 USC 371)

Date:     **MAY 1 6 2022**

City and state:     New York, New York

S/Sarah Netburn
*Issuing officer's signature*

HON. SARAH NETBURN, US MAGISTRATE JUDGE
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____     _____ *Arresting officer's signature*     _____ *Printed name and title* |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X
                                                    :
UNITED STATES OF AMERICA
                                                    :    **SEALED INDICTMENT**
        - v. -
                                                    :
GREGOIRE TOURNANT,
                                                    :    **22 CRIM 276**
                        Defendant.              **Colorado Case No. 1:22-mj-00089-NYW**
                                                    :

- - - - - - - - - - - - - - - - - - - X

## COUNT ONE

**(Conspiracy to Commit Securities Fraud, Investment Adviser Fraud, and Wire Fraud)**

The Grand Jury charges:

### OVERVIEW OF THE SCHEME

1.    From at least in or about 2014 up through and including at least in or about March 2020, GREGOIRE TOURNANT, the defendant, and others, engaged in a scheme to defraud investors in a series of investment funds managed by Allianz Global Investors U.S. LLC ("AGI US") that, at their height, held over $11 billion in assets under management (the "Funds"). During the relevant period, AGI US was an indirect, wholly-owned subsidiary of Allianz SE ("Allianz"), one of the world's largest financial services companies and one of the world's largest insurance companies. In particular, TOURNANT and others, who acted as portfolio managers for the Funds, deceived the Funds and their investors by understating the risk to which investors'

1

assets were exposed, and therefore how the returns they touted were actually generated.

2.   GREGOIRE TOURNANT, the defendant, and others carried out the scheme in three ways.  First, TOURNANT and others overstated the level of independent oversight that AGI US and its parent company Allianz were exercising over the Funds' strategy.  Second, TOURNANT and others misrepresented the hedging and other risk-mitigation strategies they were undertaking to protect investor funds.  Third, in order to hide the riskiness of the Funds' investments, TOURNANT and others fraudulently altered documents that AGI US then provided to investors and, in violation of their fiduciary duties, failed to disclose relevant risk information to the Funds and the Funds' investors.

3.   At all relevant times, GREGOIRE TOURNANT, the defendant, and others, committed the scheme in order to hide from investors the amount of risk they caused the Funds to incur in order to generate the Funds' positive returns, attract and retain capital, and increase their compensation.  Instead of managing the Funds as promised to investors, TOURNANT deployed an investment strategy that prioritized returns over risk

management in ways that were fundamentally inconsistent with those promises.

4. As a result of this scheme to defraud, investors' funds were exposed to higher risk than promised, and investors were deprived of information about the true risks to which their investments were exposed.

5. This information was important to investors' decisions to invest and remain invested. If the truth had been provided, some investors would never have invested in the Funds; would have invested less in the Funds; would have redeemed their investments; or would otherwise have altered their investment decisions.

6. GREGOIRE TOURNANT, the defendant, and others were able to accomplish the fraud by exploiting weaknesses in AGI US's internal controls. Despite TOURNANT's claim that Allianz acted as a "master cop" looking over his shoulder, in truth and in fact, and as TOURNANT knew, no one at AGI US or Allianz was verifying that TOURNANT and his colleagues were actually adhering to the investment strategies promised to investors. For example, no risk or compliance personnel at AGI US verified, attempted to verify, or were responsible for verifying that TOURNANT and his colleagues were purchasing hedging positions within the range that was represented to investors, or adhering

to other agreed-upon risk mitigation strategies, including those specifically promised to the Funds' largest investor.

7.    After the market dislocations following the onset of the COVID-19 pandemic (the "COVID Crash") in March 2020, the Funds lost in excess of $7 billion in market value, including over $3.2 billion in lost principal, faced margin calls and redemption requests, and ultimately were shut down.  More than 100 institutional investors, representing more than one hundred thousand individuals, were victims of this scheme. These institutional investors included, among others, pension funds for teachers in Arkansas, laborers in Alaska, bus drivers and subway conductors in New York City, as well as religious organizations, engineers, and other individuals, universities, and charitable organizations across the United States. Meanwhile, during the relevant period, GREGOIRE TOURNANT, the defendant, earned from AGI US personal compensation totaling more than $60 million.

8.    Moreover, in or about the summer of 2020, after the onset of the pandemic and in order to avoid detection of the fraudulent scheme, GREGOIRE TOURNANT, the defendant, obstructed an investigation by the U.S. Securities and Exchange Commission (the "SEC") into the circumstances that led to the losses in March 2020.  Among other things, TOURNANT repeatedly directed

Stephen Bond-Nelson, a Portfolio Manager for the Funds, to lie to the SEC.

## AGI US, THE STRUCTURED ALPHA FUNDS, AND TOURNANT

9.   At all times relevant to this Indictment, AGI US was an investment adviser registered with the SEC and headquartered in New York City.  As of in or about September 2019, AGI US had nearly 300 employees and approximately $126 billion in assets under management across a variety of funds.

10.   At all times relevant to this Indictment, the Structured Alpha Funds were one of the most profitable group of funds AGI US managed.  The Structured Alpha Funds contributed more than a quarter of AGI US's profits in recent years, and employed a complex options trading strategy.  By in or about 2020, the Structured Alpha Funds had more than $11 billion in assets under management.  Approximately a dozen AGI US employees worked on the Structured Alpha Funds (the "Structured Products Group").

11.   The Funds in which GREGOIRE TOURNANT, the defendant, and others, defrauded investors were multiple private funds within the Structured Alpha Funds.  These private funds (the "Funds") were constituted as limited liability companies ("LLCs") under Delaware law.  TOURNANT also defrauded a German

investor ("Investor-1") who was invested in a fund-of-one, constituted under Luxembourg law.

12.   While some of the Funds had multiple investors (*i.e.*, so-called "pooled investment vehicles"), some were "funds-of-one," with a single investor.  These funds-of-one included not only Investor-1's fund mentioned above, but also several private funds created for the Funds' largest investor ("Investor-2"), which had more than $1.3 billion of principal invested in the Funds.

13.   As the Funds' investment advisor and managing member, AGI US and its employees, including GREGOIRE TOURNANT, the defendant, also owed fiduciary duties to the Funds and, in most cases, the investors in them.

14.   At all times relevant to this Indictment, GREGOIRE TOURNANT, the defendant, was the Chief Investment Officer and the co-lead Portfolio Manager of the Structured Alpha Funds.  As described to investors, TOURNANT had "final discretion over all investment decisions" and was "the ultimate decision maker for portfolio construction."  TOURNANT also was a member of the AGI US Executive Committee from in or about March 2017 through in or about 2019, when the Executive Committee was dissolved.  From in

or about 2015 through in or about 2019, TOURNANT was either the highest or second-highest compensated employee of AGI US.

15. At all times relevant to this Indictment, Trevor Taylor and Stephen Bond-Nelson were Managing Directors of AGI US and Portfolio Managers of the Structured Alpha Funds. Taylor served as the co-lead Portfolio Manager, alongside GREGOIRE TOURNANT, the defendant. The Portfolio Managers were aided by, among others, a group of Product Specialists that communicated with investors, including a Lead Product Specialist ("Product Specialist-1").

16. At all times relevant to this Indictment, the Structured Alpha Funds generally followed an options-based strategy that was marketed, including by GREGOIRE TOURNANT, the defendant, as providing broad market exposure while maintaining specific risk protections to safeguard against losses in the event of a market crash.

17. This options-based strategy had two components: (i) the "beta" component, which sought to deliver a return to investors equivalent to a specified benchmark index, such as the S&P; and (ii) the "alpha" component, which involved a complex strategy using options designed to deliver additional returns above the "beta" component, regardless of whether the benchmark index rose or fell. The "alpha" options strategy was marketed

to investors as including hedging positions to protect against an overnight or short-term equity-market crash.

18. AGI US did not charge a management fee, but instead charged a 30% performance fee, calculated as 30% of each Fund's quarterly returns in excess of the relevant benchmark index. The performance fees were shared between the Structured Products Group and AGI US. GREGOIRE TOURNANT, the defendant, as well as Trevor Taylor, the other lead portfolio manager, received the largest shares of the fees that went to the Structured Products Group.

## TOURNANT OVERSTATED THE LEVEL OF INDEPENDENT OVERSIGHT THAT AGI US AND ITS PARENT WERE EXERCISING OVER THE FUNDS' STRATEGY

19. In order to attract and retain investor capital for the Structured Alpha Funds, GREGOIRE TOURNANT, the defendant, highlighted both his own focus on managing risk, as well as AGI US's focus on monitoring and managing risk. To this end, TOURNANT touted the protections provided by the Funds' position within the global Allianz corporate structure, calling Allianz a "master cop" that would ensure that TOURNANT followed the risk guidelines promised to investors.

### *Investors Were Told That Risk was Being Carefully Monitored by TOURNANT and Others at the Portfolio Level, and That the Funds Offered Full Transparency*

20. For example, in a February 2014 meeting with an investor, GREGOIRE TOURNANT, the defendant, stated that he was

8

not "swing[ing] for the fences to generate returns" in his investment strategy and asserted that the Funds had "very strict controls." TOURNANT also stated that the strategy was "very focused on risk," and claimed that he personally spent 90% of his day on risk and risk control. In this same meeting, Product Specialist-1 stated in TOURNANT's presence that the Funds were willing to provide "full transparency," including risk reports and scenario test results, because they had "nothing to hide." Product Specialist-1 described the Funds as the "anti-hedge fund."

### Investors Were Told That Allianz was the "Master Cop" and That Independent Risk and Compliance Functions Were in Place

21. In addition to the assurances by GREGOIRE TOURNANT, the defendant, that he and his team were focused on ensuring that the risk mitigation strategy promised to investors was being followed, TOURNANT highlighted the additional protections that investors would receive by investing in an Allianz-affiliated fund. In a February 6, 2014 investor meeting, TOURNANT described Allianz as a "master cop," noting that he had "behind me one of the largest and most conservative insurance companies in the world monitoring every position that I take to make sure that from a legal, compliance, and risk standpoint that I'm well within guidelines, so I have this kind of master — master cop, if you will, on top, which is very, very different

9

than if I had my own hedge fund firm, where in some form or fashion I can overrule about anything." TOURNANT noted that at the Funds, in contrast, "I just cannot do that," meaning run the Funds without oversight.

22. As part of these assurances that Allianz had the risk and compliance controls in place to ensure compliance with the promised strategy, GREGOIRE TOURNANT, the defendant, also made specific representations that the Funds were overseen by independent risk management personnel. TOURNANT represented that the Funds' risk management strategy included a "second line of defense" described as an "independent enterprise risk management function" supported by an "independent service provider" whose function provided an "independent" check on the portfolio team's risk management protocols.

23. In a slide that was frequently included in investor presentations, AGI US claimed that there were "two pillars of risk management," and that risk was "continuously managed and monitored at both the portfolio level by the investment team and

the firm level."  The slide listed numerous controls purportedly

in place at the "firm-level."


Allianz (ⓘ)
Global Investors

## Two pillars of risk management

* Risk is continuously managed and monitored at both the portfolio level by the investment team and the firm level

| Firm-level | Portfolio-level |
| --- | --- |
| * Evaluates and monitors portfolio and counterparty risk, business risk, operational risk, and reputational risk | * Real-time risk management and monitoring based on statistical equity index behavior |
| * Independent Enterprise Risk Management function responsible for independent portfolio risk oversight monitors daily trade activity and weekly risk profiles | * Proprietary scenario and stress testing models |
| * Supported by IDS GmbH – Analysis and Reporting Services (IDS), an independent service provider | * Monitoring of bid-ask spreads for options to ensure that our restructuring discipline is executable |
| * Evaluates: | |
|   – VaR and expected shortfall | |
|   – 31 stress tests, contribution to risk by index product | |
|   – GARCH estimates of risk | |
|   – Delta, Gamma, and Vega analysis | |
|   – Analysis of performance statistics | |

24.  In truth and in fact, however, many of the "firm-

level" activities set forth in the left column were not

conducted by Enterprise Risk Management ("ERM"), AGI US's

independent risk management function.  ERM did not monitor daily

trade activity; run 31 stress tests; evaluate contribution to

risk by index product; look at GARCH estimates of risk; or

analyze performance statistics.  Also, ERM simply monitored risk: it did not manage risk in any meaningful way.

### TOURNANT's Representations Regarding Risk Mattered to Investors

25.  As GREGOIRE TOURNANT, the defendant, was well aware, risk management was important to investors because, in particular, investors evaluated the success of their investments not just in terms of absolute return, but also in terms of the risk to which the investments exposed them.  Indeed, AGI US offered different Funds with different "alpha targets," meaning different returns that portfolio managers would seek to achieve for the specific Fund.  This allowed investors to choose their desired risk-return profile.  For example, an investor comfortable with a higher degree of risk could invest in a portfolio with a higher alpha target of 10%, while an investor who wanted less risk could invest in a portfolio with a 2.5% alpha target.  Relatedly, TOURNANT knew that in evaluating the performance of the Funds, investors considered the manner and extent to which the Funds' investments were hedged.

26.  GREGOIRE TOURNANT, the defendant, also understood that investors valued the purported independence of AGI US's risk-oversight function as a means of preventing portfolio managers

from taking on excessive risk to produce returns and increase their own compensation.

## TOURNANT MISREPRESENTED THE HEDGING AND OTHER RISK-MITIGATION STRATEGIES THAT WERE MEANT TO PROTECT INVESTOR FUNDS

27. The second way that GREGOIRE TOURNANT, the defendant, and others carried out the scheme to defraud investors was by misrepresenting the hedging and other risk-mitigation strategies that they were undertaking to protect the Funds. The Funds' marketing materials stated that the use of hedging positions to protect investors from risk was central to the investment strategy. In a May 2016 publicly-available videotaped interview, TOURNANT stated that hedges that would protect the portfolios in an "extreme crash" were an "integral part of the process," and that the Funds' managers considered themselves "risk managers first, return managers second."

28. The Funds' primary hedging strategy involved purchasing long put options in a greater quantity than the put options that the Funds sold. The majority of hedging positions were deep out of the money puts called "tail risk hedges." In general, marketing materials for the Structured Alpha Funds distributed during the relevant period claimed that the long puts had strike distances between -10% and -25% "out of the money," *i.e.*, between -10% and -25% below the prevailing market

13

prices of the underlying securities.[1]  The marketing materials
also claimed that the primary objective of those hedging
positions was "to protect the strategy from a short-term equity-
market crash," which was typically defined as a decline of 10%
to 15% in less than five days.  GREGOIRE TOURNANT, the
defendant, was present at meetings where these marketing
materials were used, and also made statements to investors that,
in sum and substance, at the time the long-put positions were
purchased, they would be placed at -10% to -25% out of the
money.  Other written materials sent to investors stated that
the options portfolios were comprised of puts and calls, "with
strikes ranging from -25[% out of the money] to +10."  Marketing
materials further stated that the hedges were designed to
mitigate the risk of a margin call, which would require the
liquidation of positions at unfavorable prices.  The following
slide, which was contained in the standard pitchbooks that were
sent to existing and potential Structured Alpha Funds' investors
and used at investor presentations beginning in or about 2015,
highlighted the hedging at strike distances from -10% to -25%

---

[1] Long put options that are closer to the prevailing market price
of the underlying security are referred to as "closer to the
money."  In other words, a long-put option that is -10%, or 10%
below the market price, is closer to the money than a long put
option that is -25%, or 25% below the market price.

and stated that "The portfolio is protected from an overnight crash":



*In Late 2015, TOURNANT Began Materially Diverging From the Hedging Promised to Investors, Exposing Investors to Greater Risk*

29. Beginning in or about late 2015, the Structured Products Group, at the direction of GREGOIRE TOURNANT, the defendant, abandoned the promised hedging strategy and instead began to purchase cheaper hedges that were further out of the money, and therefore less protective in the event of a market crash. The change in hedging strategy was not disclosed to

investors.  Rather, AGI US and TOURNANT continued to represent to current and prospective investors that the hedges were -10 to -25% out of the money.  To hide the reality of the hedging positions from investors, TOURNANT altered data sent to them, as described further below.

30.  In or about late 2015, GREGOIRE TOURNANT, the defendant, expressed anger and frustration with Trevor Taylor and Stephen Bond-Nelson for spending too much of the Funds' money on hedging positions.  Around that time, the cost of hedging had increased, meaning that continuing to purchase hedges in the -10% to -25% range promised to investors would reduce the Funds' profitability, and therefore the performance fees to which AGI US and TOURNANT were entitled.  TOURNANT also recognized that the increased cost of hedging would make it more difficult for him to achieve the returns expected by investors, which could cause investors to question the Structured Alpha strategy and redeem investments.  In order to minimize spending on hedges, TOURNANT instructed Taylor to purchase cheap hedging positions, i.e., long put options, in a sufficient volume to pass a stress test used by ERM, AGI US's independent risk management function, to monitor the Funds.  These cheap hedging positions were much further out of the money than the -10% to -25% represented to investors, and therefore provided less protection in the event of a market crash.  This change in

strategy was not disclosed to investors. Rather, as TOURNANT well knew, AGI US's marketing materials for the Structured Alpha Funds continued to contain the "-10% to -25%" representation.

31. In or about February 2018, changes in market conditions caused the cost of hedging positions to further increase. After this increase, the Funds began to purchase hedges that were even further out of the money, and thus less protective. Indeed, from the end of 2015 through February 2018, the average strike distance at initiation of the tail risk hedges purchased for the Structured Alpha 500 Fund was often further than 30% out of the money. From February 2018 through the COVID Crash in 2020, the average strike distance at initiation of the tail risk hedges purchased for the Structured Alpha 500 fund was even lower, often below 40%, and at times even below 50%, out of the money. A chart showing this deviation from the represented hedge range and the actual range of the tail risk hedges, from in or about January 2018 through in or about January 2020, is shown below.



0.0%
-10.0%
-20.0%
-30.0%
-40.0%
-50.0%
-60.0%
-70.0%

ACTUAL RANGE

Jan-18 Feb-18 Mar-18 Apr-18 May-18 Jun-18 Jul-18 Aug-18 Sep-18 Oct-18 Nov-18 Dec-18 Jan-19 Feb-19 Mar-19 Apr-19 May-19 Jun-19 Jul-19 Aug-19 Sep-19 Oct-19 Nov-19 Dec-19 Jan-20

32.   GREGOIRE TOURNANT, the defendant, hid his deviation
from the promised hedging strategy from investors, the Funds,
and even other AGI US employees.  For example, TOURNANT sent
quarterly reports to the product specialists in which he falsely
represented that the hedging distances were in line with the
represented strategy, when in fact they were significantly
further out of the money.  Indeed, when Product Specialist-1,
the lead product specialist for the Funds, learned from Stephen
Bond-Nelson in or about March 2020 that the average strike
distance for the tail risk hedges of a certain Structured Alpha
Fund was 39.6% out of the money, and that the range was 22% to
55% out of the money, Product-Specialist-1 responded, "TRH [tail
risk hedges] 22% to 55% OTM.  Jesus."

***TOURNANT Also Misrepresented the Alpha Targets Used for the
Funds' Largest Investor***

33.     In addition to increasing the risk to investors by
deviating from the promised hedging strategy and hiding the fact
that he was doing so, GREGOIRE TOURNANT, the defendant, exposed
Investor-2, which had invested over $1.3 billion in the Funds,
to additional, undisclosed risk by exceeding the contractually
agreed-upon alpha targets that Investor-2 was promised in a
written agreement.

34.     As explained earlier, "alpha targets" were the returns
that portfolio managers would seek to achieve for a specific
Fund.    GREGOIRE TOURNANT, the defendant, allowed investors in
the Structured Alpha Funds to protect themselves from the risk
of a market dislocation by selecting among funds with different
alpha targets.    For example, the Structured Alpha 1000 Funds
sought returns on the alpha portion of the strategy of 1000
basis points, or 10%, on an annual basis, above the underlying
index, whereas the Structured Alpha 500 Funds sought returns on
the alpha portion of 500 basis points, or 5%.    Because higher
alpha target strategies required selling and/or buying a larger
number of options positions for a given level of assets under
management, higher alpha target strategies had significantly
greater risks.

35. With respect to Investor-2, the Funds' largest investor, GREGOIRE TOURNANT, the defendant, proposed the use of a "variable alpha target" to reduce Investor-2's exposure to downside risk. Investor-2 initially entered into an agreement codifying this proposal (the "Variable Alpha Targets Agreement" or the "Agreement") in or about January 2016. The Agreement contained specific instructions as to which alpha target AGI US was to use depending on the level of the CBOE Volatility Index ("VIX"). For example, in a lower-volatility situation, AGI US would use a lower alpha target. The Agreement provided that TOURNANT was responsible for overseeing the Funds' day-to-day adherence to the Agreement.

36. In reliance on the Agreement, Investor-2 believed that, in addition to the risk protections provided by the hedges, GREGOIRE TOURNANT, the defendant, and others would further protect Investor-2's investment by selling and/or buying fewer and less risky options at times when there was lower market volatility. Unbeknownst to Investor-2, however, TOURNANT deviated from the Agreement and used falsified reports to hide this deviation from Investor-2.

37. In or about 2016 and 2017, following the signing of the Agreement, GREGOIRE TOURNANT, the defendant, regularly showed Investor-2 reports purporting to show the net alpha targets that had been implemented over the prior quarter. The

alpha target reports TOURNANT showed were consistent with the
Agreement, leading Investor-2 to believe that the Agreement was
being followed.

38. In truth and in fact, however, the alpha target
reports that GREGOIRE TOURNANT, the defendant, showed Investor-2
in these spreadsheets were not accurate and contained altered
data to hide TOURNANT's divergence from the Agreement. TOURNANT
was frequently managing Investor-2's funds to a higher alpha
target than that which had been agreed upon. Indeed, in or
about 2018 and 2019, TOURNANT exceeded the agreed-upon alpha
targets in his management of Investor-2's funds by as much as
40% and in some cases as much as 200%. In doing so, TOURNANT
exposed Investor-2 to much greater risk than it had contracted
for.

**TOURNANT PROVIDED INVESTORS WITH ALTERED DATA AND FAILED TO
DISCLOSE RELEVANT RISK INFORMATION TO THE FUNDS AND THE FUNDS'
INVESTORS**

39. Not only did GREGOIRE TOURNANT, the defendant, mislead
investors about how the Funds were generating income by
misrepresenting the hedging and risk-mitigation strategies he
was pursuing, he also sought to withhold information that could
have revealed the true riskiness of the Funds' investments by
altering reports and other risk-related portfolio data that were
provided to certain investors. This altered material included:
(a) open position spreadsheets; (b) risk reports; (c) projected

expected value data; (d) historical performance data; (e)
holdings data; (f) attribution data; and (g) Greeks.

### TOURNANT Altered Open Position Spreadsheets to Hide Portfolio Risk

40.  In or about 2017 or 2018, GREGOIRE TOURNANT, the
defendant, directed Trevor Taylor to begin altering spreadsheets
that contained the Funds' open positions ("Open Position
Spreadsheets"), including tail risk hedges, in order to make it
appear to investors that might request these spreadsheets that
the portfolios' tail risk hedges were closer to the money than
they actually were.

41.  In making these alterations at the direction of
GREGOIRE TOURNANT, the defendant, Trevor Taylor substantially
changed the spreadsheets' representations of the strike
distances for certain of the hedges owned by the Funds.  For
example, in one instance Taylor altered a spreadsheet to make it
appear that the strike distance at initiation for one long put
hedge was -24.71%, when in actuality it was -45.01%.

42.  Consistent with his directive to Trevor Taylor,
GREGOIRE TOURNANT, the defendant, also altered tail-risk hedge
positions in Open Position Spreadsheets.  For example, on or
about January 15, 2019, in preparation for a meeting with a
prospective investor, TOURNANT prepared an Open Positions
Spreadsheet regarding a particular Structured Alpha fund that

22

differed materially from the accurate data for that fund's holdings. Specifically, TOURNANT's version reduced or eliminated positions, including tail-risk hedge positions and profit-generating positions. The effect of these alterations was to make the portfolio appear to be exposed to less risk than it actually was.

43. Later that month, on or about January 28, 2019, GREGOIRE TOURNANT, the defendant, altered a set of historical open position data that was sent to the same prospective investor, *see supra* ¶ 34. In doing so, TOURNANT increased the strike prices for over two hundred tail-risk hedge positions, which had the effect of making the tail risk hedges look substantially closer to the money than they actually were (*i.e.*,

more protected against downside risk). A chart showing some of TOURNANT's alterations is shown below.

| | Index (1) | Put / Call (2) | Expiration (3) | Active Portfolio Quantity (4) | Strategy (5) | Tournant Strike Price (6) | Actual Strike Price (7) | Difference in Strike Prices (8) = (6) - (7) |
|---|---|---|---|---|---|---|---|---|
| 1. | SPX | Put | 3/2/2018 | 544 | Tail Risk Hedge | $ 2,000 | $ 1,600 | $ 400 |
| 2. | SPX | Put | 3/2/2018 | 453 | Tail Risk Hedge | 2,050 | 1,650 | 400 |
| 3. | SPX | Put | 3/2/2018 | 190 | Tail Risk Hedge | 2,075 | 1,800 | 275 |
| 4. | SPX | Put | 3/2/2018 | 72 | Tail Risk Hedge | 1,950 | 1,300 | 650 |
| 5. | SPX | Put | 3/2/2018 | 63 | Tail Risk Hedge | 2,100 | 1,700 | 400 |
| 6. | SPX | Put | 3/2/2018 | 63 | Tail Risk Hedge | 2,100 | 1,700 | 400 |
| 7. | SPX | Put | 3/2/2018 | 63 | Tail Risk Hedge | 2,100 | 1,700 | 400 |
| 8. | SPX | Put | 3/5/2018 | 422 | Tail Risk Hedge | 2,200 | 1,850 | 350 |
| 9. | SPX | Put | 3/5/2018 | 100 | Tail Risk Hedge | 2,200 | 1,850 | 350 |
| 10. | SPX | Put | 3/9/2018 | 974 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 11. | SPX | Put | 3/9/2018 | 724 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 12. | SPX | Put | 3/9/2018 | 469 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 13. | SPX | Put | 3/9/2018 | 440 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 14. | SPX | Put | 3/9/2018 | 440 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 15. | SPX | Put | 3/9/2018 | 426 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 16. | SPX | Put | 3/9/2018 | 340 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 17. | SPX | Put | 3/9/2018 | 315 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 18. | SPX | Put | 3/9/2018 | 277 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 19. | SPX | Put | 3/9/2018 | 277 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 20. | SPX | Put | 3/9/2018 | 216 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 21. | SPX | Put | 3/9/2018 | 182 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 22. | SPX | Put | 3/9/2018 | 181 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 23. | SPX | Put | 3/9/2018 | 120 | Tail Risk Hedge | 1,875 | 1,100 | 775 |
| 24. | SPX | Put | 3/14/2018 | 109 | Tail Risk Hedge | 2,000 | 1,700 | 300 |
| 25. | SPX | Put | 3/14/2018 | 91 | Tail Risk Hedge | 2,000 | 1,700 | 300 |
| 26. | SPX | Put | 3/16/2018 | 1450 | Tail Risk Hedge | 1,900 | 1,100 | 800 |
| 27. | SPX | Put | 3/16/2018 | 460 | Tail Risk Hedge | 1,900 | 1,100 | 800 |
| 28. | SPX | Put | 3/16/2018 | 460 | Tail Risk Hedge | 1,900 | 1,100 | 800 |
| 29. | SPX | Put | 3/16/2018 | 450 | Tail Risk Hedge | 2,025 | 1,475 | 550 |
| 30. | SPX | Put | 3/16/2018 | 157 | Tail Risk Hedge | 2,075 | 1,500 | 575 |
| 31. | SPX | Put | 3/16/2018 | 154 | Tail Risk Hedge | 1,900 | 1,100 | 800 |
| 32. | SPX | Put | 3/16/2018 | 147 | Tail Risk Hedge | 1,900 | 1,100 | 800 |
| 33. | SPX | Put | 3/16/2018 | 100 | Tail Risk Hedge | 1,900 | 1,100 | 800 |
| 34. | SPX | Put | 3/16/2018 | 75 | Tail Risk Hedge | 2,125 | 1,550 | 575 |
| 35. | SPX | Put | 3/16/2018 | 40 | Tail Risk Hedge | 2,100 | 1,450 | 650 |
| 36. | SPX | Put | 3/19/2018 | 440 | Tail Risk Hedge | 1,950 | 1,600 | 350 |
| 37. | SPX | Put | 3/19/2018 | 430 | Tail Risk Hedge | 1,950 | 1,600 | 350 |
| 38. | SPX | Put | 3/19/2018 | 118 | Tail Risk Hedge | 1,950 | 1,600 | 350 |
| 39. | SPX | Put | 3/21/2018 | 109 | Tail Risk Hedge | 1,850 | 1,600 | 250 |
| 40. | SPX | Put | 3/21/2018 | 56 | Tail Risk Hedge | 1,850 | 1,600 | 250 |
| 41. | SPX | Put | 3/23/2018 | 489 | Tail Risk Hedge | 1,750 | 1,500 | 250 |

**TOURNANT *Altered Holdings Data to Hide Portfolio Risk***

44. On at least one other occasion, GREGOIRE TOURNANT, the defendant, altered holdings data to make it appear as though a particular fund had more hedges in place than it actually had, and therefore that the fund's portfolio was less risky. In or about May 2018, an investor ("Investor-3") asked for a snapshot

24

of a single day's holdings for a particular fund, among other data. TOURNANT sent Investor-3 altered holdings data, in which he had changed 31 of the 576 open positions from negative to positive. This meant that an option that was a short put, *i.e.,* a position that might lose money in a market downturn, was altered to look like a long put, *i.e.,* a hedge that might earn money in a market downturn. TOURNANT also changed "configuration codes" that briefly described these options positions. For example, he changed configuration codes for certain options positions from "short puts" or "VIX short calls" to "tail risk hedge" or "tail risk positions." The overall effect was to fraudulently show a portfolio that appeared much more protected against risk than the fund's actual portfolio.

### *TOURNANT Altered Risk Reports to Hide Portfolio Risk*

45. Beginning in or about 2015, Investment Data Services GmbH – Analysis and Reporting Services ("IDS"), a fully-owned but independent subsidiary of Allianz, began preparing daily "risk reports" for the Funds, showing projected gains or losses to each fund in different market-downturn scenarios. Prior to this time, these risk reports had been provided by a team within the Structured Products Group.

46. In communications with investors, AGI US advertised its use of these risk reports to ensure that risk in the Funds

was being managed in a manner consistent with the strategy promised to investors. AGI US also touted the fact that the risk reports were prepared by an entity that was independent of the portfolio management team that would not be subject to the same conflicts of interest.

47. During the relevant time period, numerous investors requested copies of these risk reports and received them from the Structured Products Group at the direction of GREGOIRE TOURNANT, the defendant. The fact that risk reports were purportedly independently generated was important to these investors because it provided an independent check on the investment team.

48. Beginning in or about 2014, GREGOIRE TOURNANT, the defendant, directed Stephen Bond-Nelson to begin altering risk reports that had been prepared by IDS before they were sent to investors, so as to understate projections regarding the losses that the Funds would sustain in market downturns. Bond-Nelson followed TOURNANT's direction and altered numerous risk reports that he and TOURNANT believed would be, and were, sent to investors, as well as to consultants that advised dozens of

additional investors.  TOURNANT himself altered at least one

risk report that he knew would be, and was, sent to an investor.

49.  One example of a portion of an altered report that was

sent to an investor is below:



**Original IDS Risk Report**



**Altered IDS Risk Report**

50.  GREGOIRE TOURNANT, the defendant, instructed Stephen

Bond-Nelson to alter the risk reports so that none of the

scenarios showed losses of greater than approximately -10%.

Prior to these alterations, some scenarios showed much greater

losses, in some cases more than -20%. Bond-Nelson made these alterations for years, until the collapse of the Funds in 2020.

51. By altering and directing the alteration of risk reports, GREGOIRE TOURNANT, the defendant, corrupted the independence of the data in those reports. In doing so, he deprived investors of information that would have been relevant to their investment decisions - namely that the reports they were considering had been altered by AGI US employees who had an incentive to understate the risk of the Funds' investments. Moreover, the alterations that TOURNANT in fact made and directed misled investors by systematically understating IDS's projections regarding the risk to which the Funds were exposed.

### TOURNANT Altered Expected Value Data to Hide Portfolio Risk

52. In order to further hide from investors the potential downside risk to which their investments were exposed, and perpetuate his fraudulent scheme, beginning in or about 2017, GREGOIRE TOURNANT, the defendant, and Trevor Taylor, at TOURNANT's direction, also manipulated so-called "expected value" performance projections that were shown to actual and prospective investors.

53. GREGOIRE TOURNANT, the defendant, and the other portfolio managers for the Funds developed expected value ("EV") spreadsheets in order to project how individual positions in the Structured Alpha portfolios would perform in the event of market

downturns.  An example of an EV sheet dated August 4, 2017, is
shown below:

| SPX | | |
| --- | --- | --- |
| | | 8/04/2017 |
| | | Trading Days to E |
| % Change from Current Index Levels | Index Level at Expiration | $ Payoff |
| -4.0% | 2,377.76 | $92,525 |
| -4.5% | 2,365.37 | $92,525 |
| -5.0% | 2,352.99 | $66,582 |
| -5.5% | 2,340.60 | $20,761 |
| -6.0% | 2,328.22 | ($25,061) |
| -6.5% | 2,315.84 | ($70,882) |
| -7.0% | 2,303.45 | ($116,703) |
| -7.5% | 2,291.07 | ($162,525) |
| -8.0% | 2,278.68 | ($208,346) |
| -8.5% | 2,266.30 | ($254,168) |
| -9.0% | 2,253.92 | ($299,989) |
| -9.5% | 2,241.53 | ($345,810) |
| -10.0% | 2,229.15 | ($391,632) |
| -10.5% | 2,216.76 | ($437,453) |
| -11.0% | 2,204.38 | ($483,274) |
| -11.5% | 2,191.99 | ($529,096) |
| -12.0% | 2,179.61 | ($574,917) |

54.  The left column of the chart above shows the change in
the S&P index being projected on each row (the full chart
included a range of +12.5% to -12.5%).  The middle column shows
the projected index level at expiration.  The right column,
which is the column that was altered by GREGOIRE TOURNANT, the
defendant, and Trevor Taylor, at TOURNANT's direction, shows the
expected cash payoff at expiration for a particular position.

The payoff numbers that are shaded in black show projected losses.

55. In or about 2017, GREGOIRE TOURNANT, the defendant, and Trevor Taylor, at TOURNANT's direction, began to show spreadsheets with altered EV data to investors during investor meetings. These types of meetings were often referred to as "demo meetings," during which TOURNANT and Taylor (in separate meetings), showed investors different tools that the Structured Products Group was using in the day-to-day operation of the Funds.

56. In or about 2017, GREGOIRE TOURNANT, the defendant, directed Trevor Taylor to begin altering EV sheets that were going to be shown to investors during demo meetings. Specifically, TOURNANT indicated to Taylor that he did not want investors to see EV data that reflected multiples of loss that were more than five times the premium that had been collected on the options trade.

57. The manual alteration of EV data was tedious and time-consuming. In an effort to make the alterations more efficient, on or about August 5, 2017, Trevor Taylor emailed GREGOIRE TOURNANT, the defendant, a password-protected document containing an itemized guide with eighteen step-by-step directions on how to efficiently alter the EV data. As shown in the excerpt below, in instruction number seventeen, Taylor

indicated to TOURNANT that he should be careful not to inadvertently reveal to investors that they were being shown altered EV numbers:

> 17) During a presentation, I would not put the mouse over any cells that are populated thereby showing its formula unless you did a copy paste special value.

Taylor also included other instructions to ensure that investors did not discover that the EV Spreadsheets were altered.

58. GREGOIRE TOURNANT, the defendant, and Trevor Taylor, often made numerous alterations to the EV spreadsheets. For example, on or about December 1, 2018, in preparation for a meeting with a prospective investor that was scheduled for on or about December 3, 2018, Taylor made approximately 146 alterations to the EV projections for the Structured Alpha US Equity 250 Fund. Further, on or about December 3, 2018, the day before a meeting with a different prospective investor, TOURNANT made approximately 131 alterations to the EV projections for the Structured Alpha US Equity 250 Fund. Many of TOURNANT's alterations were round number changes. In certain cases, investors made the decision to invest after receiving the altered data.

### TOURNANT Altered Performance Data to Hide Portfolio Risk

59. Between in or about 2016 through in or about March 2020, GREGOIRE TOURNANT, the defendant, altered and directed Stephen Bond-Nelson and Product Specialist-1 to alter daily

31

performance data that was sent to investors by "smoothing" the data to reduce the magnitude of the largest losses as well as the magnitude of the gains on surrounding dates as a counterbalance. This made it appear as though the Funds were less responsive to market downturns, and therefore less risky in the event of such a downturn. Daily performance data showed, day by day, the percentage by which a particular portfolio's value had changed since the day before. If the portfolio had lost 8% of its projected value from October 30 to October 31, for example, the daily performance for October 31 would be -8%. Several investors requested this data in order to assess, among other things, the day-to-day volatility of the Funds, which they viewed as an important indicator of the riskiness of their investments.

60. Between in or about 2016 and in or about 2020, GREGOIRE TOURNANT, the defendant, caused altered performance data to be sent to at least three investors in the Funds, which together invested a total of approximately $230 million.

61. For example, on or about June 30, 2016, Investor-4 emailed members of the Structured Products Group requesting daily performance data. The same day, a product specialist for the Funds ("Product Specialist-2") emailed the Performance Group, the AGI US team that provided back-office services to the Structured Products Group, requesting daily returns for the

32

Structured Alpha 1000 Plus Fund since inception. Product Specialist-2 received the data and forwarded it to GREGOIRE TOURNANT, the defendant, asking if he was comfortable sending it to Investor-4 and noting that "August 24th is a large outlier." In the spreadsheet provided by the Performance Group, the daily performance number for August 24, 2015, a period of significant market upheaval, was -18.26%.

62. On or about July 2, 2016, GREGOIRE TOURNANT, the defendant, responded to Product Specialist-2 and Product Specialist-1, "See attached—you can send this file to [Investor-4]." In the attachment, TOURNANT had made several changes to the daily numbers. For example, TOURNANT had changed the daily performance number for August 24, 2015 to -9.26, *i.e.*, a round number change of nine from the original daily performance number of -18.26%. As described above, this made the Fund appear less reactive to the late August 2015 market upheaval. On or about July 4, 2016, Product Specialist-1 sent TOURNANT's altered data to Investor-4.

63. The chart below reflects some of the other changes that GREGOIRE TOURNANT, the defendant, made to the daily performance data sent to Investor-4 on or about July 4, 2016. From on or about August 21, 2015 through on or about September 2, 2015, for example, TOURNANT made the negative daily numbers look smaller (August 21, August 24, and September 1) and

33

decreased the positive daily numbers (August 25-28, 31, and September 2). Many of TOURNANT's alterations involved round number changes; for example, Tournant altered -5.42 to -3.42, and -18.26 to -9.26.

| Performance Group Data | | Tournant Altered Data | |
|---|---|---|---|
| 2015-08-21 2015-08-21 | -5.42 | 2015-08-21 2015-08-21 | -3.42 |
| 2015-08-22 2015-08-22 | 0.00 | 2015-08-22 2015-08-22 | 0.00 |
| 2015-08-23 2015-08-23 | 0.00 | 2015-08-23 2015-08-23 | 0.00 |
| 2015-08-24 2015-08-24 | -18.26 | 2015-08-24 2015-08-24 | -9.26 |
| 2015-08-25 2015-08-25 | 5.35 | 2015-08-25 2015-08-25 | 1.35 |
| 2015-08-26 2015-08-26 | 8.37 | 2015-08-26 2015-08-26 | 1.27 |
| 2015-08-27 2015-08-27 | 3.40 | 2015-08-27 2015-08-27 | 1.30 |
| 2015-08-28 2015-08-28 | 0.70 | 2015-08-28 2015-08-28 | 0.20 |
| 2015-08-29 2015-08-29 | 0.00 | 2015-08-29 2015-08-29 | 0.00 |
| 2015-08-30 2015-08-30 | 0.00 | 2015-08-30 2015-08-30 | 0.00 |
| 2015-08-31 2015-08-31 | 0.17 | 2015-08-31 2015-08-31 | 0.07 |
| 2015-09-01 2015-09-01 | -4.58 | 2015-09-01 2015-09-01 | -2.58 |
| 2015-09-02 2015-09-02 | 5.67 | 2015-09-02 2015-09-02 | 3.50 |

### *TOURNANT Altered the Greeks to Hide Portfolio Risk*

64. In a further effort to make the Funds' investments appear less risky than they were, GREGOIRE TOURNANT, the defendant, also altered and directed Stephen Bond-Nelson to alter the "Greeks," standard metrics in options trading that are typically used to provide measures of risk associated with options positions.

65. Although GREGOIRE TOURNANT, the defendant, sometimes told investors that the Greeks were not a helpful way of tracking the riskiness of the Funds' investments, he knew that

the portfolio managers routinely tracked them, and that certain investors viewed them as useful and requested them. In recognition of this fact, at times, TOURNANT altered the Greeks before providing them to investors to make it appear that the portfolios were less risky.

66. For example, between in or about December 2015 and in or about June 2019, GREGOIRE TOURNANT, the defendant, sent a Structured Alpha investor ("Investor-5") monthly emails that included the Greeks, as well as other information. These Greeks were almost always altered to reduce the implied riskiness of the Funds' portfolios.

### TOURNANT Altered Attribution Data To Hide Portfolio Risk

67. To further perpetuate the fraudulent scheme, GREGOIRE TOURNANT, the defendant, altered attribution data that was sent to at least one investor. Attribution data showed the net realized gains attributable to the Funds' three types of positions, one of which was hedging positions. Some investors considered the attribution data for hedging, which showed the return that hedges gave for a given month, to be a useful indicator of how much the Funds were spending on hedging.

68. GREGOIRE TOURNANT, the defendant, manually altered the attribution data sent to Investor-1 to, among other things, make it appear as though Investor-1's fund was spending more on hedging than it actually was. TOURNANT understood that this

information was important to Investor-1. After one particular instance in or about October 2017 when TOURNANT caused altered attribution data to be sent to Investor-1, TOURNANT was informed that Investor-1 was "very impressed" with the information provided, "especially . . . the attribution analysis."

## THE COVID CRASH

69. Beginning in or about February 2020 and worsening in March 2020, the markets went through a period of increased volatility and severe dislocations. During this COVID Crash, the Funds collectively lost more than $7 billion in value. Ultimately, the Funds were all shut down. Investor victims lost over $3.2 billion in principal. As noted above, these victims included pension funds for retirees, religious organizations, and essential workers, as well as universities and charitable organizations. These investors were exposed to these losses because they had been deprived of truthful information about the riskiness of their investments – information that would have caused at least certain investors to redeem their investments, or to never invest in the first place.

## TOURNANT ATTEMPTED TO OBSTRUCT AN SEC INVESTIGATION

70. On or about July 15, 2020, the SEC informed AGI US that it was conducting an investigation and sent a document request to AGI US. As set forth below, in the weeks and months that followed, GREGOIRE TOURNANT, the defendant, took steps to

obstruct the SEC investigation, including by instructing Stephen Bond-Nelson to lie to AGI US's lawyers, knowing that such lies would be passed on to the SEC.

71. For example, on or about August 4, 2020, lawyers for AGI US sent Bond-Nelson a document setting forth the differences between certain risk reports produced by IDS and risk reports sent to investors. The subject line of the email included "SEC Request Item 6 – Risk Reports." In the email, the lawyers stated that they wanted to explain the differences to the SEC. Bond-Nelson spoke with GREGOIRE TOURNANT, the defendant, before responding, and TOURNANT told Bond-Nelson to respond to the lawyers' email by providing information that both TOURNANT and Bond-Nelson knew was false. Bond-Nelson, following TOURNANT's instructions, emailed the lawyers for AGI US, copying TOURNANT, and provided false information, including that the alterations were done to more accurately model the increase in volatility for certain scenarios. TOURNANT then responded to Bond-Nelson only, writing "Great thanks."

## STATUTORY ALLEGATIONS

72. From at least in or about 2014 through in or about 2020, in the Southern District of New York and elsewhere, GREGOIRE TOURNANT, the defendant, and others known and unknown, including Trevor Taylor and Stephen Bond-Nelson, willfully and knowingly combined, conspired, confederated, and agreed together

and with each other to commit offenses against the United
States, namely (a) to commit fraud in the purchase and sale of
securities, in violation of Title 15, United States Code,
Sections 78j(b) and 78ff, and Title 17, Code of Federal
Regulations, Section 240.10b-5; (b) to commit investment adviser
fraud, in violation of Title 15, United States Code, Sections
80b-6 and 80b-17; (c) to commit investment adviser fraud, in
violation of Title 15, United States Code, Sections 80b-6 and
80b-17, and Title 17, Code of Federal Regulations, Section
275.206(4)-8(a); and (d) to commit wire fraud, in violation of
Title 18, United States Code, Section 1343.

## Objects Of the Conspiracy

73.    It was a part and an object of the conspiracy that
GREGOIRE TOURNANT, the defendant, and others known and unknown,
including Trevor Taylor and Stephen Bond-Nelson, willfully and
knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce, and of the mails, and
of the facilities of national securities exchanges, would and
did use and employ, in connection with the purchase and sale of
securities, manipulative and deceptive devices and contrivances,
in violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the

38

statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

74. It was a further part and an object of the conspiracy that GREGOIRE TOURNANT, the defendant, and others known and unknown, while acting as investment advisers, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, to (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business which were fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

75. It was further part and an object of the conspiracy that GREGOIRE TOURNANT, the defendant, and others known and unknown, including Trevor Taylor and Stephen Bond-Nelson, while acting as investment advisers to pooled investment vehicles, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, to make untrue statements of material facts and

omitted to state material facts necessary to make the statements made, in light of the circumstances they were made, not misleading, to investors and prospective investors in the pooled investment vehicles, and engaged in acts, practices, and courses of business which were fraudulent, deceptive, and manipulative with respect to investors and prospective investors in the pooled investment vehicles, in violation of Title 15, United States Code, Sections 80b-6(4)and 80b-17, and Title 17, Code of Federal Regulations, Section 275.206(4)-8(a).

76.    It was a further part and an object of the conspiracy that GREGOIRE TOURNANT, the defendant, and others known and unknown, including Trevor Taylor and Stephen Bond-Nelson, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Overt Acts

77.    In furtherance of the conspiracy and to effect the illegal objects thereof, GREGOIRE TOURNANT, the defendant, and

others known and unknown, including Trevor Taylor and Stephen Bond-Nelson, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

      a.    In or about 2015, in order to minimize spending on hedges, TOURNANT instructed Taylor to begin purchasing cheaper hedge positions for the Funds that were inconsistent with the hedges promised to investors.

      b.    On or about July 2, 2016, TOURNANT altered certain daily performance numbers for the Structured Alpha 1000 Plus Fund and caused the altered data to be sent through AGI US's Manhattan office to Investor-4, who was outside the United States.

      c.    On or about November 6, 2016, TOURNANT emailed Investor-5 altered "Greeks" for the Structured Alpha 1000 Fund and the Structured Alpha 1000 Plus Fund.

      d.    On or about January 28, 2019, TOURNANT altered open position spreadsheets that were in turn sent to a prospective investor.

      e.    On or about May 3, 2019, Bond-Nelson altered four stress test scenarios included in a risk report for the Structured Alpha 500 Fund (the "April 2019 Altered Risk Report").

      f.    On or about May 8, 2019, the April 2019 Altered Risk Report was reformatted and sent to an investor.

      g.    On or about June 18, 2019, with TOURNANT's approval, Taylor altered expected value, or EV, sheets, which they

intended to show to an investor, to reduce projected loss figures by approximately 50%.

h.    On or about July 2, 2019, Bond-Nelson altered a risk report for the Structured Alpha 1000 Plus Fund, which was then emailed to an investor overseas via AGI US's Manhattan office.

i.    On or about July 10, 2019, in anticipation of an investor meeting, Taylor made alterations to an excel spreadsheet that contained the current open positions within the Structured Alpha Global Equity 350 Fund.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

78.    The allegations contained in paragraphs 1 through 71 and 77 of this Indictment are repeated and realleged as if fully set forth herein.

79.    From at least in or about 2014 through in or about 2020, in the Southern District of New York and elsewhere, GREGOIRE TOURNANT, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section

240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, TOURNANT engaged in a scheme to defraud investors in certain Structured Alpha Funds by making false and misleading statements to current and prospective investors that substantially understated the risks being taken with respect to certain funds' investments.

> (Title 15, United States Code, Sections 78j(b) & 78ff;
> Title 17, Code of Federal Regulations, Section
> 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT THREE
### (Investment Adviser Fraud)

The Grand Jury further charges:

80. The allegations contained in paragraphs 1 through 71 and 77 of this Indictment are repeated and realleged as if fully set forth herein.

81. From at least in or about 2014 through in or about 2020, in the Southern District of New York and elsewhere, GREGOIRE TOURNANT, the defendant, while acting as an investment adviser, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and

43

indirectly, to (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business which were fraudulent, deceptive, and manipulative, to wit, TOURNANT, in violation of their fiduciary duties, engaged in a scheme to defraud the Structured Alpha Funds by failing to disclose to the Funds the true risks being taken with respect to their investments.

(Title 15, United States Code, Sections 80b-6 and 80b-17; Title 18, United States Code, Section 2.)

### COUNT FOUR
**(Investment Adviser Fraud)**

The Grand Jury further charges:

82. The allegations contained in paragraphs 1 through 71 and 77 of this Indictment are repeated and realleged as if fully set forth herein.

83. From at least in or about 2014 through in or about 2020, in the Southern District of New York and elsewhere, GREGOIRE TOURNANT, the defendant, while acting as an investment adviser to pooled investment vehicles, willfully and knowingly used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, to make untrue statements of material facts and omitted to state material facts

44

necessary to make the statements made, in light of the
circumstances they were made, not misleading, to investors and
prospective investors in the pooled investment vehicles, and
engaged in acts, practices, and courses of business which were
fraudulent, deceptive, and manipulative with respect to
investors and prospective investors in the pooled investment
vehicles, to wit, TOURNANT, engaged in a scheme to defraud
investors and prospective investors in pooled investment
vehicles, specifically the Structured Alpha Funds, by making
false statements to investors and prospective investors and
failing to disclose to investors and prospective investors the
true risks being taken with respect to the Funds' investments,
in some cases in violation of their fiduciary duties.

(Title 15, United States Code, Sections 80b-6(4) and 80b-17;
Title 17, Code of Federal Regulations, Section 275.206(4)-8;
Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Conspiracy to Obstruct Justice)

The Grand Jury further charges:

84. The allegations contained in paragraphs 1 through 71
and 77 of this Indictment are repeated and realleged as if fully
set forth herein.

85. From in or about July 2020 through at least in or
about May 2021, in the Southern District of New York and
elsewhere, GREGOIRE TOURNANT, the defendant, and others known
and unknown, including Stephen Bond-Nelson, willfully and

45

knowingly combined, conspired, confederated, and agreed together
and with each other to commit an offense against the United
States, namely, to obstruct justice.

86. It was a part and an object of the conspiracy that
GREGOIRE TOURNANT, the defendant, and others known and unknown,
including Stephen Bond-Nelson, willfully, knowingly, and
corruptly would and did influence, obstruct, and impede the due
and proper administration of the law under which a pending
proceeding was being had before a department and agency of the
United States, to wit, an investigation by the SEC's Division of
Enforcement, in violation of Title 18, United States Code,
Section 1505.

## Overt Acts

87. In furtherance of the conspiracy and to effect the
illegal objects thereof, GREGOIRE TOURNANT, the defendant, and
others known and unknown, including Stephen Bond-Nelson,
committed the following overt acts, among others, in the
Southern District of New York and elsewhere:

    a. In or about August 2020, TOURNANT discussed with
Bond-Nelson providing false information to in-house counsel to
cover up their participation in the scheme to defraud, including
alterations to risk reports sent to investors and prospective
investors.

b.    On or about August 5, 2020, Bond-Nelson included knowingly false information in an email response to AGI US in-house counsel, who TOURNANT and Bond-Nelson understood were seeking information to respond to a subpoena from the SEC regarding the Structured Alpha Funds.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

88.    As a result of committing one or more of the offenses charged in Counts One through Four of this Indictment, GREGOIRE TOURNANT, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

## Substitute Assets Provision

89.    If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with,

a third party; has been placed beyond the jurisdiction of the court;

   c. has been substantially diminished in value; or

   d. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

    (Title 18, United States Code, Section 981(a)(1)(C);
     Title 21, United States Code, Section 853(p);
     Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

GREGOIRE TOURNANT,

Defendant.

### SEALED INDICTMENT

22 Cr. _____

(Title 15, United States Code, Sections
78j(b), 78ff, 80b-6, & 80b-17; Title 17, Code
of Federal Regulations, Sections 240.10b-5 &
275.206(4)-8; and Title 18, United States
Code, Sections 2 & 371.)

DAMIAN WILLIAMS
United States Attorney

Foreperson